UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHRISTOPHER BUCKLEY,<br><br>          Plaintiff,<br><br>v.<br><br>INSEEGO CORP.<br><br>          Defendant. | CIVIL ACTION NO.:<br><br><br><br>FEBRUARY 16, 2021 |

## **COMPLAINT**

Plaintiff Christopher Buckley, as and for his complaint against the defendant, Inseego Corp. ("Inseego") alleges as follows:

### PRELIMINARY STATEMENT

1. Buckley worked for Inseego from June 18, 2018 until July 23, 2020, when Inseego wrongfully terminated his employment for opposing business practices that violated public policy concerning sales projections for publicly-traded companies, and that were unscrupulous and unfair trade practices. Moreover, Inseego intentionally and willfully discriminated against Buckley in the terms, conditions, and privileges of his employment at Inseego because of his sexual orientation.

### PARTIES

2. Christopher Buckley is a resident of the State of Connecticut.

3. Inseego is a corporation organized under the laws of the State of Delaware, with headquarters in San Diego, California.

4. Inseego employed Buckley from June 18, 2018 to July 23, 2020. Throughout Buckley's tenure, Inseego assigned him to work remotely from his home in Connecticut.

PROCEDURAL PREREQUISITES

5. On October 27, 2020, Plaintiff filed a "dual charge" of discrimination against Defendant with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC").

6. On November 18, 2020, the EEOC uploaded a Notice of Right to Sue letter regarding charge no. 523-2021-00161 to the EEOC public portal. (*See* Exhibit A.) Neither Buckley nor his counsel received a copy of the Notice of Right to Sue by mail or email from the EEOC.

JURISDICTION AND VENUE

7. Buckley's claims pursuant to Title VII raise questions of federal law. This Court has jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction of the Buckley's remaining claims, which arise from the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

8. In addition, plaintiff and defendant are citizens of different states: Buckley is a citizen of Connecticut and Inseego is a citizen of both Delaware and California. The amount in controversy exceeds $75,000. Thus, this Court has jurisdiction over Buckley's claims pursuant to 28 U.S.C. § 1332.

9. The District of Connecticut is the appropriate venue for this matter. Plaintiff resides in Connecticut, and worked in Connecticut for Inseego for the duration of his employment with Inseego.

FACTUAL ALLEGATIONS

10. Buckley started working for Inseego Corp. ("Inseego") on June 18, 2018, as a Senior Director – Distribution. His job was to transform Inseego's distribution model from direct

sales to indirect by building a two-tier distribution and channel structure for resellers to buy Inseego products from distributors, rather than directly from Inseego. This was part of a larger strategy to increase Inseego's profitability. The majority of Inseego's sales volume comes from direct sales to mobile carriers, but the profit margin for these sales was only 20%. Sales volume in the distribution and channel structure was expected to be lower than direct sales, but with a 40-65% profit margin, modest distribution and channel sales would lift Inseego's profit margin overall.

11. In the fall of 2018, Inseego launched the initial channel program Buckley created. Senior leadership lauded him for his success and, in early 2019, Inseego promoted Buckley to Vice President Distribution and Channels. In his annual performance review in early 2020, Inseego rated his performance as meeting expectations or exceeding expectations in all categories.

12. When he started working at Inseego, Buckley worked closely with his peer, Stephen P. Brown. They participated on sales calls with their manager, Rick Harris, the Senior Vice President of IoT Sales (for "Internet of Things,") IoT Sales was one of Inseego's two main sales apparatuses. The other is Mobility sales, i.e., sales to mobile carriers. Brown handled outside sales and Buckley was in charge of channel sales, i.e., sales to customers who purchased Inseego products from a third-party distributor rather than directly from Inseego.

13. Cellco Partnership, Inc. dba Verizon Wireless ("Verizon") is one of Inseego's largest customers. From July 9-11, 2019, Buckley attended the Verizon Partner Summit in Alpharetta, Georgia, with Brown and another peer, Robert Thomas. Thomas worked for the Mobility Business Unit and was the primary account manager for Verizon. As Buckley often worked with the Verizon team, Buckley was in contact with Thomas by telephone, email, or

videoconference at least once per week.

14. As is typical for these multi-day work meetings, socializing continued well after business hours. While chatting with Brown and Thomas at a table near the bar, the subject of homosexuality came up. Brown said something – Buckley does not remember the exact statement – but the comment was somewhat derisive and negative toward homosexuality and homosexuals. Buckley is gay and, since he worked with these men, he decided to stop Brown before he said something highly offensive that would likely hurt their working relationship. Buckley told them he is gay, married, and has children. He showed them pictures of his family. Buckley's sexuality was not a secret: Buckley is out and his marriage to his husband was the subject of more than one news article. Buckley simply chose not to share details of his personal life at work. Both Brown and Thomas expressed shock and surprise, apparently because Buckley does not use the stereotypical mannerisms or speech patterns of gay men on television.

15. Brown's and Thomas's reactions to Buckley's revelation could not have been more different. Although both shared their beliefs that their own sons are gay, it was clear that Thomas felt more comfortable with the possibility of his son being gay than Brown was. Thomas and Buckley spoke often about their respective families. Brown and Buckley spoke very little about their families for the rest of Buckley's employment. Brown became guarded around Buckley, limiting their conversations to the business at hand. Gone was the easy banter they shared. For example, they had a co-worker who complained a lot. Brown used to say this co-worker would "complain about a blow job." While Buckley does not condone Brown's coarse language in the workplace, it was typical of the boy's club culture at Inseego. Brown purposefully excluded Buckley from the banter after Buckley came out to him. As a gay man, Buckley was not part of the boy's club anymore.

16. After Inseego terminated his employment, Buckley called former colleague Eric Simon, who had been terminated two weeks prior and who worked at Inseego's San Diego headquarters. He was the Vice President for Information Technology and worked closely with the C-Suite team. Buckley told him that he was abruptly terminated and had no idea why. Buckley mentioned that he did not know if his being gay played a role in Inseego's decision. Until that call, Simon did not know Buckley was gay, but was unfazed by the fact. He stated, however, that Inseego leadership would have had a problem with his sexuality. Simon was intimately aware of the boy's club culture and homophobia in the C-Suite and among Inseego leadership.

17. Rick Harris left Inseego by the end of April 2020 and Brown was promoted to replace him as SVP of IoT Sales. Brown started reporting to Mark Frisch, who was promoted to EVP of Sales-North America. Mark Frisch reports directly to Dan Mondor, Inseego's CEO. Brown and Mondor worked together in at least two prior organizations – Spectralink Corp. and Mitel Networks Corporation. Mondor recruited Brown to join Inseego before Inseego hired Rick Harris. Following his promotion, Buckley reported directly to Brown.

18. Brown is a pro-Trump conservative and vocal in support of the former president and nationalist political agenda. Brown contributed to Trump's reelection campaign and shared his political views openly and frequently. For example, Brown would often make pro-Trump pronouncements on conference calls and in meetings. Buckley found Brown's constant Trump proselytizing to be tiresome, oppressive, and inappropriate for the workplace. Buckley told Brown more than once that while Buckley generally does not have an issue with Republican policy, he takes issue with Trump as an immoral and unethical person. Eventually Brown's pronouncements became less frequent, but they never stopped. Buckley had been Facebook

"friends" with Brown until mid-2020, and most of Brown's posts were pro-Trump articles and memes.

19.     Even though the friendly aspect of their professional relationship seemed to be cooling, Buckley's working relationship with Brown seemed to be ok. After Brown terminated his employment, Buckley realized that Brown kept him around only long enough to complete the channel optimized program ("Channel Program 2.0"). This program was highly anticipated by Inseego senior leaders and the C-Suite. It tracked through the "swim lanes" report that was shared with Dan Mondor weekly. Brown and Buckley worked on the go-to-market strategy for the IoT team together, as evidenced in a Microsoft Teams document they shared. Channel Program 2.0 rolled out on schedule, on July 15, 2020, and was well-received. Mondor complimented the Chief Marketing Officer on the program.

20.     Since Buckley was in charge of indirect sales – sales through the distribution and channel structure – Buckley was in charge of forecasting indirect sales. His method for doing this involved reviewing the customer call information Inseego's sales representatives input into Salesforce, the sales software Inseego used to track potential sales through the pipeline. Based on the sales reps' estimates of the likelihood of closing, historical closing rates, his 20 years' experience in the cellular connectivity industry, and after consulting with key colleagues, Buckley delivered what his experience has proven to be solid sales forecasts upon which distributors could rely when deciding how much of what product to buy.

21.     The reliability of Inseego's indirect sales forecast was critical to the growth and continued success of Inseego's distributor sales channel that Buckley started in 2018, and which Brown and Buckley just finished optimizing with Channel Program 2.0. Buckley knew distributors wanted just enough inventory on hand to meet their customers' needs for, at most,

the next 90 days. If the distributors buy too few units, they lose business; if they buy too many units, their capital is tied up in unsold inventory. This makes the accuracy of Inseego's indirect sales forecast critical. Inseego's interests are best served if its distributors know they can rely on its forecasts. Handled correctly, the distributors will buy as much product as Inseego tells them to buy and when Inseego tells them to buy. Handled incorrectly – i.e., by inflating sales forecasts and inducing distributors to buy product that will sit in inventory – the distributors will find another supplier.

22.     Shortly after he became Buckley's manager, in April or May 2020, Brown started pushing Buckley to increase Inseego's second quarter revenue by inducing the distributors to purchase more product than the sales forecast indicated they should buy. This raised red flags for Buckley due to the predictable reactions of the distributors to unreliable forecast numbers. Buckley explained the demand was not sufficient to justify additional orders. Citing the deal pipeline, Brown disagreed. After consulting with his colleague Victor Gerth, whom Brown put in charge of inside and outside sales, Buckley explained the pipeline was in early stage and cannot does not justify the distributor's taking on additional inventory.

23.     Brown persisted: he wanted Buckley to press Inseego's distributors to place additional product orders even though Inseego's indirect sales forecasts did not justify their taking on additional inventory. Buckley explained to Brown and Gerth that his reputation with the distributors is too valuable to squander on this scheme. Buckley refused to manipulate the distributors, injure his reputation, and jeopardize Inseego's distribution and channel sales overall by lying to the distributors about a solid indirect sales forecast that was anything but solid. Referring to Inseego's distributors, Brown said, "Well what do they do for us anyway?"

24.     Brown pushed Buckley to instruct his team to forecast sales aggressively in

7

Salesforce. He wanted Buckley's team to indicate that early-stage opportunities were likely to close, when Buckley's knowledge and experience led him to know that the opportunities in the indirect sales funnel were not solid enough to justify forecasting them as distributor orders in Salesforce. The Dell opportunity is an example. It was a project Brown spearheaded. He set pricing with them, and guided substantial certification and marketing spends. The Dell opportunity represented a significant chunk of what Brown wanted added to the forecast. Despite Brown's efforts, the Dell opportunity was not nearly as solid as he led the senior leadership team to believe. Accordingly, it did not belong in Salesforce as a distributor-forecasted sale. Upon information and belief, the Dell opportunity has not resulted in the sales Brown forecasted.

25.     Buckley refused to falsify the forecasts, but the sales forecasts reported to senior management each week reflected Brown's inflated numbers. Upon information and belief, Brown either directed someone else to make the changes in Salesforce or he made the changes himself.

26.     In June 2020, Buckley learned from Thomas that the Mobility sales unit, led by Mark Frisch, reached an agreement with Verizon to sell Inseego's Skyus 160 product at price one-third less than what IoT Sales sold Skyus 160 to Inseego's distributors. Specifically, Inseego would sell the product to Verizon for $199, and to Inseego's distributors for $299.25. With a slim profit margin, the distributors would have to sell the Skyus 160 to a reseller for about $315, and the reseller would attempt to charge the end user the Manufacturer's Suggested Retail Price of $399. Buckley warned Brown and Thomas of the havoc this pricing disparity would wreak with Inseego's distributors.

27.     The agreement with Verizon was not yet public knowledge, but it coincides with Brown's relentless pressure to falsify the indirect sales forecasts to coerce distributors to buy

more product than they needed. Brown needed Inseego to meet its second quarter sales goals and demonstrate that its strategy to increase its profit margin was succeeding.

28. Verizon's advantage went far beyond the possibility of selling the Skyus 160 for $300 over cost. As a carrier, Verizon played by a different set of rules from the distributor and reseller due to the ongoing nature of its relationships with its customers. Instead of selling the Skyus 160 to the end user for the MSRP, Verizon was able to subsidize the cost to the end user, and sell the product at a loss for $99, knowing it would make up the loss in service contracts with its customers.

29. Inseego's distributors were livid: no rational person would buy a Skyus 160 for $399 if they could buy it for $99. Again, Buckley alerted Brown and Thomas to the problem. The pricing disparity was going to affect Inseego's ability to sell the Skyus 160 to distributors and all but ensured that Inseego would not meet the inflated sales forecast Brown submitted to senior management each week.

30. On July 22, 2019, Buckley sent an email to Brown and others in the sales department, recommending an immediate proactive response to the distributors' concerns. Buckley listed possible responses and suggested that they meet to discuss his suggestions and other possible responses. Brown responded in an email asking for details designed to stall the meeting Buckley requested. Buckley was terminated the following day.

31. On Thursday July 23, 2020, at about 12:00 p.m., Buckley received a Skype call from Brown and HR Manager Michelle Ortega. Brown stated that it was Buckley's last day at Inseego, then he muted himself and Ortega took over the conversation. Buckley pressed Brown to explain why Inseego was terminating his employment. He unmuted himself and said, "This is a business alignment decision." Ortega interrupted any exploration of what the "business

alignment" may be, stating, "I am taking over." Ortega proceeded to explain how his termination affects COBRA, vacation pay, stock options, etc. She then asked for his personal email address and confirmed that Buckley was being locked out of the company network immediately.

32. After the Skype call ended, Buckley texted Brown, stating that Brown needs to give Buckley a coherent reason for terminating his employment. Brown response, "I know it's hard Chris, but this was a business alignment decision." Buckley asked for, but did not get, more clarification than that.

33. Buckley texted Dan Mondor, Mark Frisch, and Ashish Sharma (Inseego's President) with messages to the effect, "I was surprised by how this ended for me but thank you for having the opportunity." All three senior executives replied by thanking him for his work and offering to be of any assistance in the future.

34. Sometime later, Thomas asked Brown and Frisch why Buckley was terminated. Thomas characterized Brown's response as "corporate mumbo-jumbo," as Thomas was not given any coherent answer. Frisch told Thomas, "I, of course, knew about it, but it was Steve's initiative to terminate Chris."

35. Frisch was primarily responsible for the deal in which Inseego agreed to sell Skyus 160 to Verizon at a massive discount from the price it sold Skyus 160 to distributors. The impending disruption to the IoT Sales channel can be laid at Frisch's feet, so it is no surprise he would favor aggressive sales forecasting over ethical, reality-based sales forecasting.

36. This also provides much needed context to Brown's insistence that Buckley inflate the indirect sales forecasts. Inseego's EVP Sales – North America created a situation that would, when it became public, kill Inseego's sales to distributors. Brown had a narrow window between the execution of the deal with Verizon and the public announcement of the deal to

manipulate distributors to stock up on inventory so Inseego could report meeting its sales volume target in 2Q2020 and an increase in profit margin. Inseego knew distributors would not purchase after the deal became public.

37. Buckley's work at Inseego had always been well-received and his performance reviews all show that Buckley met or exceeded their expectations. If his performance were an issue, Inseego would have initiated a performance improvement plan. In any event, Buckley was paid out 100% of his compensation plan for all of 2020, which evidences good performance not poor performance.

38. Despite Brown's corporate mumbo-jumbo, Buckley's role and his performance were in complete alignment with corporate strategy. Channel Program 2.0, the IoT sales strategy Brown and Buckley developed, was implemented by Inseego. Brown and Frisch created the compensation plan that reflected Inseego's joint work on the strategy.

39. Critically, Inseego did not eliminate his position; there was no budgetary misalignment informing the decision to terminate his employment. In fact, shortly after terminating his employment, Inseego posted his position on LinkedIn and, one week later, posted it on the company website. Upon information and belief, Inseego hired a new VP of Channels, whose employment began on September 21, 2020. On further information and belief, the person who replaced Buckley is not gay.

40. In the weeks since his employment was terminated, Buckley has heard from former colleagues and customers. All were as surprised as Buckley was by the sudden termination of his employment. Buckley was well-liked and respected by his colleagues, both senior and junior. His distributors and channel partners all liked and respected him.

41. Having no reasonable explanation for Inseego's decision to terminate his

employment, Buckley believes that Inseego wrongfully terminated his employment in violation of public policy because Buckley opposed its scheme to knowingly overstate Inseego's sales forecasts to the SEC, in statements to securities analysts, Inseego's distributors, and the investing public. Inseego's fraudulent sales forecast scheme served the joint aims of (a) meeting Inseego's sales volume forecast; (b) increasing second quarter distributor sales before the Verizon agreement became public and caused distributor sales to drop off; and (c) proving the effectiveness of their strategy to increase their profit margin.

42.     The falsified indirect sales forecasts were especially immoral, unethical, oppressive, and unscrupulous because Inseego knew it had entered into a highly preferential pricing deal with Verizon (a) discriminated against Inseego's distributors; and (b) would make the distributors' pricing so much higher than Verizon's pricing that they could not compete. Thus, Mr. Brown's scheme to falsify the indirect sales forecasts would cause Inseego's distributors to stock up on product that resellers did not need and would not have bought due to the distributors' considerably higher prices.

43.     Inseego purports to operate in an honest and ethical manner and to be an equal opportunity employer. The Inseego Corp. Code of Conduct and Ethics ("Code of Conduct") states, "[i]t is the policy of Inseego to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of Inseego depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity." (Code of Conduct § 1, Honest and Ethical Conduct) Notwithstanding this, Brown pressured Buckley to inflate Inseego's sales forecasts and compromise his personal integrity. When Buckley refused, someone else inflated the forecast, presumably Brown or someone acting at his behest. Buckley would not compromise

his ethics by falsifying forecasts for Inseego's distributors and the public, so Inseego terminated his employment.

44. The Code of Conduct also states, "Inseego is an equal opportunity employer. Consistent with applicable laws, we do not tolerate unlawful discrimination against … employees based on … sexual orientation … or any other basis protected by federal, state or local laws." (Code of Conduct § 8, Treatment with Fairness and Respect) Inseego's policy "applies to all of [its] operations and every aspect of the employment relationship, including … disciplinary action (including termination)." (*Id.*) Notwithstanding this, Brown changed how he treated Buckley upon learning that Buckley is a married gay man. believes Inseego terminated his employment because Buckley is a married gay man with children, which is anathema to Inseego's boy's club culture and the known homophobia of Inseego's C-Suite and senior leaders at its California headquarters.

## COUNT ONE: WRONGFUL TERMINATION

45. Buckley repeats and restates the allegations contained in Paragraphs 1 through 44 as if fully set forth herein.

46. Inseego terminated Buckley's employment because he refused to participate in Inseego's scheme to inflate its indirect sales forecast to induce its distributors to purchase more inventory than they needed, and to meet its 2Q2020 sales target. Inseego set upon this scheme before its deal with Verizon became public, knowing that the news of the Verizon deal would cause its indirect sales to plummet and negatively affect its ability to meet its sales volume target.

47. Further, Inseego's inflated sales forecast operates as a fraud on investors by giving the appearance that Inseego's future business expectations are more robust than they

actually are. The forecasts were untrue when they were made and, accordingly, evince the intent to deceive, manipulate or defraud the investing public. Mr. Buckley opposed inflating Inseego's sales forecasts and, consequently, Inseego wrongfully terminated him in violation of the public policy set forth in the Securities Exchange Act of 1934.

48. Inseego inflated its indirect sales forecast for the specific purpose of inducing distributors to purchase inventory they did not need. Lying to one's customers to induce them to purchase inventory that they cannot return is bad enough, but Inseego business practices moved beyond the merely unethical and self-defeating to immoral, oppressive, and unscrupulous because it knew that once the Verizon deal was public, the real indirect sales forecast would plummet far lower than the reliable indirect sales forecast Buckley supported. Inseego had a narrow window before the Verizon deal became public to maximize its sales to distributors, and it did everything it could to induce its distributors to waste money on inventory it would not be able to sell.

49. Buckley interfered with this highly unscrupulous scheme and, accordingly, Inseego fired him. Thus, Inseego terminated Buckley's employment in violation of the public policy set forth in the Connecticut Unfair Trade Practices Act and the California Unfair Competition Law.

**COUNT TWO: SEX DISCRIMINATION IN
VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

50. Plaintiff repeats and restates the allegations set forth in Paragraphs 1 through 49 as if fully set forth herein.

51. Buckley Parenti is a member of a protected class under Title VII because of his sex (male). Buckley is homosexual.

52. Buckley was at all times qualified for his position Vice President Distribution and Channels. He originated the role, creating the distributorship model for the sale of Inseego products. In formal evaluations, including an evaluation early in 2020, his performance was always rated "meets expectations" or "exceeds expectations."

53. Buckley's termination substantially because of Brown's homophobia, along with the homophobia of the Inseego's senior managers and C-Suite were motivating factors in selecting him for termination. Brown was rather public with his reactionary political beliefs and treated Buckley at arm's length after Buckley informed Brown that he is gay.

54. The corporate "mumbo-jumbo" reason given for terminating Buckley's employment – the "business alignment decision" – is unavailing as a nondiscriminatory reason to terminate Buckley's employment. Nothing in the business was realign. Inseego back-filled Buckley's position. Buckley's sex was a substantial and motivating factor in why Inseego terminated his employment.

55. As a result of Specialized's sex discrimination, Buckley has suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

(a) Compensatory Damages;

(b) Punitive Damages;

(c) Costs;

(d) Prejudgment interest;

(e) Attorneys' Fees

(f) Such other and further relief in law or equity as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all questions of fact raised by his Complaint.

      Respectfully submitted,

      CHRISTOPHER BUCKLEY

By: /s/ _____
Mark P. Carey (ct17828)
Frances Codd Slusarz (ct24442)
Carey & Associates, P.C.
71 Old Post Road, Suite 1
Southport, CT 06890
(203) 255-4150 tel.
(203) 255-0380 fax
mcarey@capclaw.com
fslusarz@capclaw.com

*His Attorneys*